**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| *In re New Era Enterprises Inc. Data Incident Litigation* | Case No. 4:25-cv-00732<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Maria Sanchez, Ernest Williams, Ebony White, Steven Stapp, and Timothy Kirker ("Plaintiffs") bring this Consolidated Class Action Complaint ("Complaint") against New Era Enterprises, Inc. ("Defendant") as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1.      Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard sensitive information of its customers.

2.      Defendant is a life insurance company that operates New Era Life Insurance Company, New Era Life Insurance Company of the Midwest, Philadelphia American Life Insurance Company, and Life of America Insurance Company.

3.      Plaintiffs' and Class Members' (defined below) sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised and unlawfully accessed in a data breach publicly disclosed by Defendant on February 11, 2025 (the "Data Breach").

4.     Defendant collected and maintained certain personally identifiable information about Plaintiffs and the putative Class Members, who are (or were) customers of Defendant.

5.     The personal and medical information compromised in the Data Breach included Plaintiffs' and Class Members' names, Social Security numbers, addresses, dates of birth ("personally identifiable information" or "PII"), and health insurance policy numbers, Medicare identification numbers, and data related to medical treatments and diagnoses ("protected health information" or "PHI" and collectively with PII, "Private Information").

6.     The Private Information compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target Private Information for its value to identity thieves.

7.     As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

8.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect consumers' Private Information from a foreseeable and preventable cyber-attack.

9. Moreover, upon information and belief, Defendant was targeted for a cyber-attack due to its status as an insurance company that collects and maintains highly valuable Private Information on its systems.

10. Defendant maintained, used, and shared the Private Information in a reckless manner. In particular, the Private Information was used and transmitted by Defendant in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

11. Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

12. Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct, because the Private Information that Defendant collected and maintained has been accessed and acquired by data thieves.

13. Armed with the Private Information accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class

Members' names but with another person's photograph, and giving false information to police during an arrest.

14.    As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

15.    Plaintiffs and Class Members may also incur out-of-pocket costs, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16.    Plaintiffs bring this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

17.    Through this Consolidated Class Action Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

18.    Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000

exclusive of interest and costs, and members of the proposed Class are citizens of states different from Defendant.

20.    This Court has jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Defendant's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## PARTIES

22.    Plaintiff Maria Sanchez is, and at all relevant times has been, a resident and citizen of the State of Texas, where she intends to remain.

23.    Plaintiff Ernest Williams is, and at all relevant times has been, a resident and citizen of the State of Pennsylvania, where he intends to remain.

24.    Plaintiff Ebony White is, and at all relevant times has been, a resident and citizen of the State of Mississippi, where she intends to remain.

25.    Plaintiff Steven Stapp is, and at all relevant times has been, a resident and citizen of the State of Nebraska, where he intends to remain.

26.    Plaintiff Timothy Kirker is, and at all relevant times has been, a resident and citizen of the State of Michigan, where he intends to remain.

27.    Defendant New Era Enterprises, Inc. is a corporation with its principal place of business located in Houston, Texas.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

28.    Defendant is a life insurance company that operates New Era Life Insurance Company, New Era Life Insurance Company of the Midwest, Philadelphia American Life Insurance Company, and Life of America Insurance Company.

29.    Plaintiffs and Class Members are current and former customers of Defendant.

30.    In the course of their relationship, customers, including Plaintiffs and Class Members, provided Defendant with their sensitive Private Information.

31.    Upon information and belief, in the course of collecting Private Information from customers, including Plaintiffs, Defendant promised to provide confidentiality and adequate security for the data it collected from customers through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

32.    Indeed, Defendant provides on its website that:

We abide by strict internal standards established to maintain your confidentiality when we share or disclose any information concerning you to third parties or non-affiliated entities.

We maintain physical, electronic, and procedural safeguards that meet state and federal regulations in the protection of your personal information. We give access only to employees who need to know the personal information to provide insurance products or services to you.[1]

33.    Plaintiffs and the Class Members, as customers of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers, in general, demand security to

---

[1] https://apps.neweralife.com/site/documents/PrivacyPolicy.pdf

safeguard their Private Information, especially when their Social Security numbers and other sensitive Private Information are involved.

### *The Data Breach*

34.    In or about February 2025, Defendant began sending Plaintiffs and other Data Breach victims a Notice of Data Breach letter (the "Notice Letter"), informing them that:

> What Happened? On December 18, 2024, we identified suspicious activity in our IT network. We immediately initiated our incident response protocols, which included isolating certain systems and beginning an investigation with assistance from a third-party cybersecurity firm. We have also reported the incident to law enforcement. Our investigation determined that an unauthorized person accessed our IT network between December 9, 2024, and December 18, 2024, and, during that time, ***copied*** some of our files.[2] [emphasis added]

35.    Omitted from the Notice Letter were the identity of the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

36.    This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

37.    Moreover, in its Notice Letter, Defendant failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members

---

[2] The "Notice Letter". A sample copy is available at
https://ago.vermont.gov/sites/ago/files/documents/2025-02-
12%20New%20Era%20Enterprises%20Data%20Breach%20Notice%20to%20Consumers.pdf

should report their misuse to Defendant, and whether Defendant set up any mechanism for Class Members to report any misuse of their data.

38.    Defendant had obligations created by the FTC Act, Gramm-Leach-Bliley Act, contract, common law, and industry standards to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

39.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

40.    The attacker accessed and acquired files containing unencrypted Private Information of Plaintiffs and Class Members. Plaintiffs' and Class Members' Private Information was accessed and stolen in the Data Breach.

41.    Plaintiffs further believe that their Private Information and that of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

***Data Breaches Are Preventable***

42.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

43.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

44.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[3]

45.     To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs,

---

[3] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[4]

46.     To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts

---

[4] *Id.* at 3-4.

- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[5]

47.    Given that Defendant was storing the Private Information of its current and former customers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

48.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, tens of thousands of individuals, including that of Plaintiffs and Class Members.

### *Defendant Acquires, Collects, And Stores Its Customers' Private Information*

49.    Defendant acquires, collects, and stores a massive amount of Private Information on its current and former customers.

50.    As a condition of obtaining services at Defendant, Defendant requires that customers and other personnel entrust it with highly sensitive personal information.

51.    By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

---

[5] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

52.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

53.     Upon information and belief, in the course of collecting Private Information from customers, including Plaintiffs, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

54.     Plaintiffs and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### Defendant Knew, Or Should Have Known, of the Risk Because Insurance Companies In Possession Of Private Information Are Particularly Susceptible To Cyber Attacks

55.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting insurance companies that collect and store Private Information, like Defendant, preceding the date of the Breach.

56.     Data breaches, including those perpetrated against insurance companies that store Private Information in their systems, have become widespread.

57.     In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 victims. Of the 3,205 recorded data compromises, 809 of them, or 25.2%, were in the medical or healthcare adjacent industries. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points.  The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

58.     In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

59.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets. Hence, they are aware of and prepared for a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[6]

60.     Additionally, as companies became more dependent on computer systems to run their business,[7] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[8]

61.     The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to

---

[6]     https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection

[7] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html

[8]     https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, Private Information is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, medical information, and other personal information on several underground internet websites. Unsurprisingly, the insurance industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

62.    According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[9]

63.    A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[10] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[11]

64.    The specific data compromised in this Data Breach – including health insurance information and records of medical conditions – is precisely the kind of information that can be used to perpetrate medical identity theft. According to the Federal Trade Commission, "[m]edical identity theft is when someone uses your personal information — like your name, Social Security

---

[9] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content
[10] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/
[11] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/

number, health insurance account number or Medicare number — to get medical care, see a doctor, get prescription drugs, buy medical devices, or submit claims with your insurance provider."[12]

65.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[13]

66.    Defendant knew and understood that unprotected or exposed Private Information in the custody of insurance companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

67.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

68.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

69.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

---

[12] https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed May 13, 2025)
[13] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/

70.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

71.     As an insurance company in custody of the Private Information of its customers, Defendant knew, or should have known, the importance of safeguarding Private Information entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### Value Of Personally Identifying Information

72.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

73.     The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[16]

---

[14] 17 C.F.R. § 248.201 (2013).

[15] *Id.*

[16] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

74.     For example, Personal Information can be sold at a price ranging from $40 to $200.[17] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[18]

75.     Of course, a stolen Social Security number – which, upon information and belief, were compromised for some Class Members in the Data Breach – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

76.     It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

77.     According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information

---

[17] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[18] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

increases."[19] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[20]

78.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[21]

79.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[22] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[23]

80.    What's more, it's not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility

---

[19] *See*
https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[20] *Id.*
[21] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf
[22] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/
[23] *See* https://www.investopedia.com/terms/s/ssn.asp

of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

81.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

82.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.")

---

[24] BMaria Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

83.     Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[25]

84.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

85.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[26]

86.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the

---

[25] *See* https://oag.ca.gov/idtheft/facts/your-ssn
[26] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[27]

87.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[28]

88.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

### *Defendant Fails To Comply With FTC Guidelines*

89.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

90.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal consumer information that they keep; properly dispose

---

[27] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187 (last visited June 10, 2025).
[28] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[29]

91.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[30]

92.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

93.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

94.     These FTC enforcement actions include actions against insurance companies, like Defendant.

---

[29] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf
[30] *Id.*

95.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

96.     Defendant failed to properly implement basic data security practices.

97.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the Private Information of its customers or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

98.     Upon information and belief, Defendant was at all times fully aware of their obligation to protect the Private Information of its customers, Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### Defendant Failed to Comply With The Gramm-Leach-Bliley Act

99.     Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

100.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

101.    Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq*., and is subject to numerous rules and regulations promulgated on the GLBA statutes.

102.    The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

103.    Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

104.    Both the Privacy Rule and Regulation P require insurance companies to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6.

These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

105.    Upon information and belief, Defendant failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' Private Information and storing that Private Information on Defendant's network systems.

106.    Defendant failed to adequately inform their customers that they were storing and/or sharing, or would store and/or share, the customers' Private Information on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the customer relationship ended.

107.    The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires insurance companies to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

108.    As alleged herein, Defendant violated the Safeguard Rule.

109.    Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information and failed to monitor the systems of its IT partners or verify the integrity of those systems.

110.    Defendant violated the GLBA and its own policies and procedures by sharing the Private Information of Plaintiffs and Class Members with a non-affiliated third party without providing Plaintiffs and Class Members (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

### *Defendant Fails To Comply With Industry Standards*

111.    As noted above, experts studying cyber security routinely identify insurance companies in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

112.    Several best practices have been identified that, at a minimum, should be implemented by insurance companies in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

113.    Other best cybersecurity practices that are standard for insurance companies include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems;

protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

114.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

115.    These foregoing frameworks are existing and applicable industry standards for insurance companies, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### Common Injuries & Damages

116.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access

and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

### *Data Breaches Increase Victims' Risk Of Identity Theft*

117.    The unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

118.    Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

119.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize it. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

120.    Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

121.    Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the

federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[31]

122.    Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[32]

123.    "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[33] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account."[34]

124.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[35]

---

[31] *See* N.C. Gen. Stat. § 132-1.10(1).

[32] *See* https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers

[33] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/

[34] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/

[35] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Maria Krebs, *Medical Records for Sale in Underground*

125.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

126.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

127.    The existence and prevalence of "Fullz" packages means that the Private Information stolen from the Data Breach can easily be linked to the unregulated data (like contact information) of Plaintiffs and the other Class Members.

128.    Thus, even if certain information (such as contact information) was not stolen in the Data Breach, criminals can still easily create a comprehensive "Fullz" package.

129.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### *Loss Of Time To Mitigate Risk Of Identity Theft & Fraud*

130.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this

*Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

131.    Thus, due to the actual and imminent risk of identity theft, Defendant, in its Notice Letter instructs Plaintiffs and Class Members to take the following measures to protect themselves: "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity."[36]

132.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

133.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[37]

134.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity),

---

[36] Notice Letter.
[37] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[38]

135.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

### *Diminution of Value of Private Information*

136.    Private Information is a valuable property right.[39] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

137.    Sensitive Private Information can sell for as much as $363 per record, according to the Infosec Institute.[40]

138.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[41]

---

[38] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

[39] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[40] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[41] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

139.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who, in turn, aggregates the information and provides it to marketers or app developers.[42, 43]

140.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[44]

141.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

142.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

143.    The fraudulent activity resulting from the Data Breach may not come to light for years.

144.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[42] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[43] https://datacoup.com/
[44] https://digi.me/what-is-digime/

145. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to, upon information and belief, tens of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

146. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

147. Given the type of targeted attack in this case, sophisticated criminal activity, and the type of Private Information involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

148. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

149. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

150.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

### *Loss Of Benefit Of The Bargain*

151.    Furthermore, Defendant's poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for insurance services, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### *Plaintiff Maria Sanchez's Experience*

152.    Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations.

153.    At the time of the Data Breach—December 9, 2024 through December 18, 2024—Defendant maintained Plaintiff's Private Information in its system.

154.    Plaintiff Sanchez is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

155.    Plaintiff Maria Sanchez received the Notice Letter, by U.S. mail, directly from Defendant, in or about February 2025. According to the Notice Letter, Plaintiff's Private Information was improperly targeted, accessed, and obtained by unauthorized third parties.

156.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity[,]"[45] Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

157.    Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

---

[45] Notice Letter.

158. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

159. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

160. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

161. Plaintiff Maria Sanchez has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Ernest Williams's Experience

162. Plaintiff Williams's Private Information was entrusted to New Era in exchange for insurance services.

163. Plaintiff and Class Members' Private Information was entrusted to New Era with the reasonable expectation and mutual understanding that Defendant would keep such information confidential and secure from unauthorized access.

164. Plaintiff Williams received a notice letter from New Era dated February 14, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.[46]

165. Plaintiff Williams is very careful about sharing his sensitive information.

---

[46] *See* New Era breach notification letter, available at:
https://consumer.sc.gov/sites/consumer/files/Documents/Security%20Breach%20Notices/2025/NewEraEnterprisesInc.pdf

166.    Plaintiff Williams stores any documents containing his Private Information in a safe and secure location. Plaintiff Williams has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

167.    Because of the Data Breach, Plaintiff Williams's Private Information is now in the hands of cybercriminals.

168.    Plaintiff Williams has suffered actual injury from the exposure and theft of his Private Information—which violates his right to privacy.

169.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Williams is now imminently at risk of crippling future identity theft and fraud.

170.    Since the Data Breach, Plaintiff Williams has experienced a significant increase in the number of spam emails and telephone calls he receives. Plaintiff Williams attributes the foregoing suspicious and unauthorized activity to the Data Breach, given the time proximity, the fact that he is very careful with his Private Information, and the fact that he has never experienced anything like this prior to now.

171.    As a result of the Data Breach, Plaintiff Williams has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Williams has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, screening spam calls and emails, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

172.     The letter Plaintiff Williams received from New Era specifically directed him to take the actions described above. Indeed, the breach notice that Defendant posted to its website advised individuals affected by the breach to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for unauthorized activity."[47] In addition, the breach notice advised victims of the Data Breach of additional steps they should take, including placing a fraud alert on their file through a credit reporting agency, freezing their credit, disputing fraudulent transactions, and filing reports with law enforcement.[48]

173.     As a result of the Data Breach, Plaintiff Williams has experienced stress, anxiety, and concern due to the loss of his privacy and concern over the impact of cybercriminals accessing and misusing his Private Information. Plaintiff Williams fears that criminals will use his information to commit identity theft.

174.     Plaintiff Williams anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

175.     Plaintiff Williams has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Williams's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Williams's Private Information that was entrusted to New Era; (d) damages unjustly retained by New Era and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from New Era and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Williams's Private Information; and (e) continued risk to Plaintiff Williams's

---

[47] *Id.*
[48] *Id.*

Private Information, which remains in the possession of New Era and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### *Plaintiff Ebony White's Experience*

176.    Plaintiff White's Private Information was entrusted to New Era in exchange for health insurance services.

177.    Plaintiff and Class Members' Private Information was entrusted to New Era with the reasonable expectation and mutual understanding that they would keep such information confidential and secure from unauthorized access.

178.    Plaintiff White received a notice letter from New Era dated February 14, 2025, informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.[49]

179.    Plaintiff White is very careful about sharing her sensitive information.

180.    Plaintiff White stores any documents containing her Private Information in a safe and secure location. Plaintiff White has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

181.    Because of the Data Breach, Plaintiff White's Private Information is now in the hands of cybercriminals.

182.    Plaintiff White has suffered actual injury from the exposure and theft of her Private Information—which violates her right to privacy.

---

[49] *See* New Era breach notification letter, available at:
https://consumer.sc.gov/sites/consumer/files/Documents/Security%20Breach%20Notices/2025/NewEraEnterprisesInc.pdf

183.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff White is now imminently at risk of crippling future identity theft and fraud.

184.    Since the Data Breach, Plaintiff White has received notice from her Smart Credit monitoring service that her information has been posted to the dark web. Further, Plaintiff White has experienced a significant increase in the number of spam phone calls and emails she receives. Plaintiff White attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, and the fact that she has never experienced anything like this prior to now.

185.    As a result of the Data Breach, Plaintiff White has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff White has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and other information, screening spam calls, contacting credit bureaus, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

186.    The letter Plaintiff White received from New Era specifically directed her to take the actions described above. Indeed, the Breach Notice that Defendant mailed to Plaintiff White advised individuals affected by the Data Breach to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for unauthorized activity."[50] In addition, the Breach Notice advised victims of the Data Breach of additional steps they should

---

[50] *Id.*

take, including placing a fraud alert on their file through a credit reporting agency, freezing their credit, disputing fraudulent transactions, and filing reports with law enforcement.[51]

187.    As a result of the Data Breach, Plaintiff White has experienced stress, anxiety, and concern due to the loss of her privacy and concern over the impact of cybercriminals accessing and misusing her Private Information. Plaintiff White fears that criminals will use her information to commit identity theft.

188.    Plaintiff White has already and anticipates spending considerable further time and money on an ongoing basis to remedy the harms caused by the Data Breach.

189.    Plaintiff White has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff White's Private Information being placed in the hands of cybercriminals; (c) actual identity theft and the resultant financial penalties associated with it; (d) damages to and/or diminution in value of Plaintiff White's Private Information that was entrusted to New Era; (e) damages unjustly retained by New Era at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff White's Private Information; and (f) continued risk to Plaintiff White's Private Information, which remains in the possession of New Era and which is subject to further breaches so long as it fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to it.

---

[51] *Id.*

*Plaintiff Steven Stapp's Experience*

190.    Plaintiff Stapp's Private information was entrusted to New Era in exchange for insurance services.

191.    Plaintiff and Class Members' Private information was entrusted to New Era with the reasonable expectation and mutual understanding that Defendant would keep such information confidential and secure from unauthorized access.

192.    Plaintiff Stapp received a notice letter from New Era dated February 14, 2025, informing him that his Private information was specifically identified as having been exposed to cybercriminals in the Data Breach.[52]

193.    Plaintiff Stapp is very careful about sharing his sensitive information. To the best of Plaintiff's knowledge, he has never before had his Private information exposed in any other data breach.

194.    Plaintiff Stapp stores any documents containing his Private information in a safe and secure location. Plaintiff Stapp has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

195.    Because of the Data Breach, Plaintiff Stapp's Private information is now in the hands of cybercriminals.

196.    Plaintiff Stapp has suffered actual injury from the exposure and theft of his Private information—which violates his right to privacy.

197.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Stapp is now imminently at risk of crippling future identity theft and fraud.

---

[52] *See* New Era breach notification letter, available at:
https://consumer.sc.gov/sites/consumer/files/Documents/Security%20Breach%20Notices/2025/NewEraEnterprisesInc.pdf

198.    Since the Data Breach, Plaintiff Stapp has experienced identity theft. For example, since the Data Breach, Mr. Stapp has received notification that his information has been posted to the dark web. Further, Plaintiff Stapp has also experienced a significant increase in the number of spam emails and telephone calls he receives. Plaintiff Stapp attributes the foregoing suspicious and unauthorized activity to the Data Breach, given the time proximity, the fact that he is very careful with his Private information, and the fact that he has never experienced anything like this prior to now.

199.    As a result of the Data Breach, Plaintiff Stapp has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Stapp has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, enrolling in credit monitoring services, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

200.    The letter Plaintiff Stapp received from New Era specifically directed him to take the actions described above. Indeed, the breach notice that Defendant posted to its website advised individuals affected by the breach to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for unauthorized activity."[53] In addition, the breach notice advised victims of the Data Breach of additional steps they should

---

[53] *Id.*

take, including placing a fraud alert on their file through a credit reporting agency, freezing their credit, disputing fraudulent transactions, and filing reports with law enforcement.[54]

201.    As a result of the Data Breach, Plaintiff Stapp has experienced stress, anxiety, and concern due to the loss of his privacy and concern over the impact of cybercriminals accessing and misusing his Private information. Plaintiff Stapp fears that criminals will use his information to commit identity theft.

202.    Plaintiff Stapp anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

203.    Plaintiff Stapp has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Stapp's Private information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Stapp's Private information that was entrusted to New Era; (d) damages unjustly retained by New Era and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from New Era and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Stapp's Private information; and (e) continued risk to Plaintiff Stapp's Private information, which remains in the possession of New Era and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private information that was entrusted to them.

---

[54] *Id.*

*Timothy Kirker's Experience*

204.    Plaintiff Kirker's Private information was entrusted to New Era as a former employee.

205.    Plaintiff and Class Members' Private information was entrusted to New Era with the reasonable expectation and mutual understanding that Defendant would keep such information confidential and secure from unauthorized access.

206.    Plaintiff Kirker received a notice letter from New Era dated February 14, 2025, informing him that his Private information was specifically identified as having been exposed to cybercriminals in the Data Breach.[55]

207.    Plaintiff Kirker is very careful about sharing his sensitive information. To the best of Plaintiff's knowledge, he has never before had his Private information exposed in any other data breach.

208.    Plaintiff Kirker stores any documents containing his Private information in a safe and secure location. Plaintiff Kirker has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

209.    Because of the Data Breach, Plaintiff Kirker's Private information is now in the hands of cybercriminals.

210.    Plaintiff Kirker has suffered actual injury from the exposure and theft of his Private information—which violates his right to privacy.

211.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Kirker is now imminently at risk of crippling future identity theft and fraud.

---

[55] *See* New Era breach notification letter, available at:
https://consumer.sc.gov/sites/consumer/files/Documents/Security%20Breach%20Notices/2025/NewEraEnterprisesInc.pdf

212.     Since the Data Breach, Plaintiff Kirker has experienced multiple instances of identity theft. For example, in April of 2025, Mr. Kirker received a notification from an identity theft monitoring product provided through his bank that his information was posted to the dark web. Specifically, Plaintiff Kirker's name, Social Security number, and telephone number were found on the dark web in April of 2025. Plaintiff Kirker attributes this to the Data Breach considering his name, Social Security number, and telephone number were posted to the dark web *after* the Data Breach and his name and Social Security number were stolen in the Data Breach. Further, following the Data Breach, Plaintiff Kirker received multiple notifications that someone is attempting to log in to his Coinbase account without permission.

213.     As a result of the Data Breach, Plaintiff Kirker has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Kirker has already expended approximately 10-15 hours monitoring his accounts, researching the data breach, reviewing and pulling his credit report, and contacting his bank to discuss the dark web alert he received from the bank's monitoring product. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

214.     The letter Plaintiff Kirker received from New Era specifically directed him to take the actions described above. Indeed, the breach notice that Defendant posted to its website advised individuals affected by the breach to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for unauthorized activity."[56] In addition, the breach notice advised victims of the Data Breach of additional steps they should

---

[56] *Id.*

take including, placing a fraud alert on their file through a credit reporting agency, freezing their credit, disputing fraudulent transactions, and filing reports with law enforcement.[57]

215.    As a result of the Data Breach, Plaintiff Kirker has experienced stress, anxiety, and concern due to the loss of his privacy and concern over the impact of cybercriminals accessing and misusing his Private information. Plaintiff Kirker fears that criminals will use his information to commit identity theft.

216.    Plaintiff Kirker anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

217.    Plaintiff Kirker has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Kirker's Private information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Kirker's Private information that was entrusted to New Era; (d) damages unjustly retained by New Era and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from New Era and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Stapp's Private information; and (e) continued risk to Plaintiff Kirker's Private information, which remains in the possession of New Era and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private information that was entrusted to them.

---

[57] *Id.*

## CLASS ALLEGATIONS

218.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

219.    The Class that Plaintiffs seek to represent is defined as follows:

All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant (the "Class").

220.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

221.    Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

222.    <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of Defendant, upon information and belief, thousands of individuals were impacted. The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

223.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

    a.   Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

    b.   Whether Defendant had respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

    c.   Whether Defendant had respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

    d.   Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

    e.   Whether and when Defendant actually learned of the Data Breach;

    f.   Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

    g.   Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

    h.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    i.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

    j.   Whether Plaintiffs and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct;

k. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

224. <u>Typicality:</u> Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

225. <u>Policies Generally Applicable to the Class:</u> This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

226. <u>Adequacy:</u> Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

227. <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

228.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

229.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

230.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

231.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to

provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

232.    Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

233.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendant failed to timely notify the Plaintiffs and the class of the Data Breach;

    b.  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c.  Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    e.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

    f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

234.    Plaintiffs re-allege and incorporate by reference all of the allegations above, as if fully set forth herein.

235.    Defendant requires its customers, including Plaintiffs and Class Members, to submit non-public Private Information in the ordinary course of providing its insurance services.

236.    Defendant gathered and stored the Private Information of Plaintiffs and Class Members as part of its business of soliciting its services to its customers, which solicitations and services affect commerce.

237.    Plaintiffs and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

238.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

239.    By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

240.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

241.    Defendant's duty to use reasonable security measures also arose under the GLBA, under which they were required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

242.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the Private Information.

243.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of being customers at Defendant.

244.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

245.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

246.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' Private Information it was no longer required to retain pursuant to regulations.

247.     Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

248.     Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

249.     Defendant breached its duties, pursuant to the FTC Act, GLBA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.  Failing to adequately monitor the security of their networks and systems;

    c.  Allowing unauthorized access to Class Members' Private Information;

    d.  Failing to detect in a timely manner that Class Members' Private Information had been compromised;

    e.  Failing to remove former customers' Private Information it was no longer required to retain pursuant to regulations, and

    f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

250. Defendant violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

251. Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act and GLBA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statutes were intended to guard against.

252. Defendant's violation of Section 5 of the FTC Act and the GLBA constitute negligence.

253. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

254. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

255. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the insurance industry.

256. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

257.    Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems or transmitted through third party systems.

258.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

259.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

260.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

261.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

262.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

263.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

264.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or

risk of imminent harm suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

265.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

266.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

267.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

268.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to

future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

269.    Plaintiffs re-allege and incorporate by reference all of the allegations above, as if fully set forth herein.

270.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendant, of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

271.    Defendant's duty to use reasonable security measures also arose under the GLBA, under which they were required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

272.    Defendant violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect Private Information and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

273.    Defendant's violation of Section 5 of the FTC Act and GLBA constitutes negligence *per se.*

274.    Class Members are consumers within the class of persons that Section 5 of the FTC Act and GLBA were intended to protect.

275.    Moreover, the harm that has occurred is the type of harm that the FTC Act and GLBA intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

276.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

277.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

278.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains

backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

279.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

280.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

281.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

282.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and insecure manner.

283.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

<u>COUNT III</u>
**Breach Of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

284.    Plaintiffs re-allege and incorporate by reference all of the allegations above, as if fully set forth herein.

285.    Plaintiffs and Class Members were required to deliver their Private Information to Defendant as part of the process of obtaining insurance services provided by Defendant. Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services and would not have paid for Defendant's insurance services, or would have paid less for them, had they known that Defendant's data security practices were substandard.

286.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

287.    Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

288.    Plaintiffs and the Class entrusted their Private Information to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

289.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

290.    Based on Defendants' conduct, representations (including those in its Privacy Policy), legal obligations, and acceptance of Plaintiffs' and the Class Members' Private Information, Defendants had an implied duty to safeguard their Private Information through the use of reasonable industry standards.

291.    Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

292.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

293.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

294.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

295.    Plaintiffs and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

296.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

297.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

298.    Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

299.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

300.    Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

301.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

302.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with

attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

303. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

304. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT IV
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

305. Plaintiffs re-allege and incorporate by reference all of the allegations above, as if fully set forth herein.

306. Plaintiffs bring this Count in the alternative to the breach of implied contract count above.

307. Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they paid Defendant and/or its agents for insurance services and in so doing also provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendant the services that were the subject of the transaction and should have had their Private Information protected with adequate data security.

308.     Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

309.     Defendant failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

310.     Defendant acquired the Private Information through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

311.     If Plaintiffs and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information to Defendant or obtained services from Defendant.

312.     Plaintiffs and Class Members have no adequate remedy at law.

313.     Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

314.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

315.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

316.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

317.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

    iv.    requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information for Plaintiffs' and Class Members' respective lifetimes;

    v.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the

Private Information of Plaintiffs and Class Members;

vi.    prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vii.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.    requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi.    requiring Defendant to conduct regular database scanning and securing checks;

xii.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xiii.    requiring Defendant to routinely and continually conduct internal training and

education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect herself;

xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii.    for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any

deficiencies with compliance of the Court's final judgment;

D.      For an award of damages, including actual, nominal, consequential, and punitive

damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all claims so triable.


Dated: June 17, 2025                          Respectfully Submitted,

By: */s/ Gary M. Klinger*
Gary M. Klinger*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
Email: gklinger@milberg.com

Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
214-744-3000
214-744-3015 (Facsimile)
jkendall@kendalllawgroup.com

Jeff Ostrow*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-332-4200
ostrow@kolawyers.com

Leigh S. Montgomery
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455 lmontgomery@eksm.com

A. Brooke Murphy*
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
Telephone: (405) 389-4989
abm@murphylegalfirm.com

William B. Federman*
Tanner R. Hilton*
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
4131 North Central Expressway, Suite 900
Dallas, Texas 75204
wbf@federmanlaw.com
trh@federmanlaw.com

Marc H. Edelson*
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N300
Newtown, PA 18940
Telephone: (215) 867-2399
medelson@edelson-law.com

Mark S. Reich
Melissa G. Meyer
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
Email: mreich@zlk.com
Email: mmeyer@zlk.com

*Pro Hac Vice admitted*

*Attorneys for Plaintiffs and
The Proposed Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 17, 2025, a copy of the foregoing was served on all Parties that have appeared in this action electronically through the U.S. District Court, Southern District of Texas ECF system to all counsel of record all of whom are Filing Users of the Court's Electronic Filing System.

*/s/ Gary M. Klinger*
Gary M. Klinger
